Filed 9/26/13  P. v. Rodriguez CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038219 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC809758) |
| v. | |
| DAVID OWEN RODRIGUEZ, | |
| Defendant and Appellant. | |

A jury convicted defendant David Owen Rodriguez of first degree murder. Defendant contends that his conviction must be reversed because the trial court's instruction regarding voluntary intoxication failed to describe the effect of intoxication on the specific intent required for first degree murder by means of torture. We conclude that the trial court did not err in failing to instruct on the relationship between intoxication and the mental state for torture murder, and we therefore will affirm.

### FACTUAL AND PROCEDURAL HISTORY

#### The Prosecution's Evidence

At 10:30 a.m. on March 18, 1981, Robert Oswald's half-brother, Paul Bernards, entered Oswald's San Jose apartment, and Bernards saw Oswald's dead body on the bedroom floor. Bernards called the police.

San Jose Police Department Sergeant Henry Schriefer responded to Oswald's apartment. When Sergeant Schriefer entered the apartment, he saw a bloody razor blade

and a small amount of blood on the living room floor. The living room curtains were closed, and there was blood on the cord that controlled the opening and closing of the curtains. A coffee table was pushed up against the couch in the living room, and a planter on top of the table was tipped over. There was a small amount of blood on the couch. Sergeant Schriefer entered the bedroom and saw Oswald's body, which was covered with lacerations, puncture wounds, and abrasions. A serrated knife and a bloody towel were on the floor near Oswald's body. Sergeant Schriefer saw a wet wash rag and a bloody towel in the dressing room, and he saw diluted blood on the sink, toilet, and floor of the bathroom. Sergeant Schriefer's report noted that "[f]or the amount of injuries to the victim, very little blood was noted."

Dr. John Hauser performed an autopsy on Oswald's body on March 19, 1981. Dr. Hauser discovered several fractured bones in the neck, and he testified that such fractures were common in manual strangulation cases. Dr. Hauser saw numerous cuts and stab wounds on the face, neck, trunk, hands, wrists, abdomen, and left arm. In particular, Dr. Hauser noted cuts on the forehead, cheeks, and eyelids, as well as "abundant" bleeding in the left eye. A one-and-a-half-inch cut extended from the left side of the mouth up to the left cheek, and a one-inch cut extended from the right side of the mouth up to the right check. Each of these cuts completely penetrated the thickness of the cheek. There was a laceration at the base of the tongue and a little bleeding associated with the laceration. There were cuts on and near the ear, one of which gaped open to reveal cartilage. Dr. Hauser noted two stab wounds on the chest, two stab wounds on the abdomen, cuts on the colon and bowel, and a small amount of blood in the belly. There were numerous cuts on the back and several cuts on the wrists. Dr. Hauser determined that Oswald's death was caused by manual strangulation and multiple cuts and stab wounds.

Dr. Michelle Jorden testified as an expert in forensic and anatomic pathology. She opined that the primary cause of Oswald's death was manual strangulation, and that the many stab and incise wounds were contributory causes of Oswald's death. She explained that the "massive" fractures in Oswald's neck, along with the associated bruising and bleeding, led her to believe that manual strangulation was the primary cause of Oswald's death. She further explained, "This is probably the worst injury I have seen documented in a strangulation case." She classified the stab and incise wounds as contributory causes of death because those wounds alone could have potentially killed Oswald, and because the stab and incise wounds decreased the likelihood that Oswald would survive the strangulation. Dr. Jorden determined that the manner of Oswald's death was homicide.

Dr. Jorden testified that Oswald's injuries fell into three different categories: antemortem (injuries inflicted when Oswald was alive), perimortem (injuries inflicted when Oswald was close to death), and postmortem (injuries inflicted when Oswald was dead). She opined that the many cuts on Oswald's back were inflicted during the antemortem period, explaining that the wounds actively bled and soaked Oswald's shirt with blood. Due to the bleeding associated with the cuts and stab wounds on Oswald's eyelids, ear, neck, chest, and abdomen, Dr. Jorden concluded that those wounds were inflicted during the antemortem or perimortem period. She determined that the cuts to Oswald's wrists were inflicted during the perimortem period, explaining that there was very little blood associated with the cuts. Due to the lack of blood in the surrounding tissues, Dr. Jorden determined that the cuts to Oswald's mouth were inflicted during the postmortem period.

San Jose Police Department Lieutenant Michael Destro was present at the autopsy, and he saw that a gold charm and ring had adhered to Oswald's upper back. The charm and ring appeared to have been forcibly separated from a necklace chain. The chain was

3

not on Oswald's body, and police did not find a chain during an extensive search of Oswald's apartment.

Four bloodstains were present on the left front pocket of the pants Oswald was wearing. The stains were symmetrical and linear in pattern. There were two additional bloodstains by the entry to the pocket, as well as a single bloodstain on the interior lining of the pocket. A bloodstain expert opined that the bloodstains were consistent with four bloody fingers touching the pocket and a single bloody finger pulling the lining out.

Police investigation did not produce a suspect, and the case became a cold case. In 2008, criminalists conducted DNA testing on several items of evidence. The testing revealed that defendant was the source of DNA obtained from the bloody razor blade. Defendant was the source of DNA obtained from the linear bloodstains on the left front pocket of Oswald's pants, as well as the source of DNA obtained from the lining of the pocket. Defendant was the source of DNA obtained from a bloodstained orange and yellow towel. Defendant was a "possible major contributor" to a mixture of DNA on a bloodstained blue, green, and white towel.

As part of the autopsy, Dr. Hauser subjected Oswald's blood to toxicology testing. The blood contained 0.3 parts per million of methamphetamine.

Criminalist Trevor Gillis testified as an expert in drug symptomatology. He explained that a blood-methamphetamine concentration of 0.3 parts per million is a non-fatal concentration and an average concentration in the abuse population. He also explained that it is "next to impossible to predict symptomatology" from the concentration of methamphetamine in a person's blood. He did, however, describe the following "spectrum of effects" that could be caused by methamphetamine ingestion: increased heart rate, increased breathing rate, panic, irritability, nervousness, and increase in adrenaline. Gillis noted that, with sustained use, methamphetamine can cause a psychotic break. He also noted that some studies show that violent activity is associated

4

with methamphetamine use, and those studies further show that a methamphetamine user is more likely to be the victim than the aggressor.

Bernards testified that Oswald used methamphetamine. Bernards had "frequently" seen Oswald when he was under the influence of methamphetamine, and Bernards testified that Oswald was always jubilant and always in a good mood when he was under the influence of methamphetamine. Bernards never saw Oswald become aggressive, irritable, or violent when he was under the influence of methamphetamine.

### The Defense Evidence

Defendant testified that he was working as a prostitute in March of 1981. Oswald agreed to pay defendant money for sex, and they went to Oswald's apartment. Defendant and Oswald sat in the living room, and defendant used a razor blade to cut lines of methamphetamine. Defendant and Oswald each snorted one line of methamphetamine. Approximately 10 to 15 minutes after they ingested the methamphetamine, Oswald became "aggressive" and "aggravated." Oswald told defendant that he could not leave the apartment, and Oswald cut defendant's arm and fingers with the razor blade. Oswald gave defendant a towel to wipe the blood from his injuries, and Oswald said, "See what you made me do?" Defendant stood up to leave the apartment. Oswald stabbed defendant's shoulder with a steak knife, causing a cut that was "not life-threatening." Oswald looked "crazy" and "wild," and defendant was afraid that he was going to die. Defendant and Oswald struggled for control of the knife. Defendant "did everything [he] possibly could to stay alive." Defendant admitted punching Oswald, strangling Oswald, and stabbing Oswald's chest and abdomen. Defendant eventually gained control of the knife, and Oswald stopped struggling. Defendant dragged Oswald into the bedroom, and defendant ran out of the apartment.

Defendant testified that the methamphetamine he ingested on the night of the charged crime made him feel "submissive, easy-going, friendly." The methamphetamine

5

did not make defendant feel agitated. Defendant admitted that methamphetamine can "alter someone's perception of things around them." Defendant emphasized, however, that the methamphetamine he ingested did not "take the fear away." He also emphasized that the methamphetamine he ingested "didn't change the way [he] looked at things." Defendant explained that his testimony regarding the charged crime came "directly from [his] mind."

Dr. Susan Ditter, an expert in forensic psychology and neurology, performed a "psychological autopsy" on Oswald. A psychological autopsy is a reconstruction of "the personality, the relationships, and the entire life history" of a dead person. In order to conduct the psychological autopsy of Oswald, Dr. Ditter consulted 26 sources of information, including mental health records from Oswald's hospitalizations at state institutions, interviews with Oswald's family and friends, and police reports. She concluded that Oswald suffered from borderline personality disorder and polysubstance abuse. She also determined that when Oswald was in a romantic or sexual relationship, he would engage in "shoving, slapping, pushing, intense verbal abuse, screaming." When Oswald was under the influence of methamphetamine, he would become "enraged to the point of violence with a weapon."

Dr. Paul Herrmann, an expert in forensic pathology, testified that Oswald's death was caused by strangulation. He testified that "a lot" of Oswald's stab wounds and incise wounds were inflicted after Oswald was dead. Specifically, Dr. Herrmann testified that the cuts to Oswald's mouth, neck, and ear were inflicted after Oswald was dead, and that the stab wounds on Oswald's abdomen were "absolutely characteristic" of wounds inflicted after death. He testified that the cuts on Oswald's back were "probably" inflicted before Oswald died.

6

A bloodstain expert opined that the stains on the left front pocket of Oswald's pants were attributable to "low-velocity droplets caused by gravity." The expert testified that "no bloody fingers went in and out of that pocket."

### *Verdict, Sentence, and Appeal*

A jury convicted defendant of first degree murder (Pen. Code, § 187). The jury found that he personally used a deadly or dangerous weapon (Pen. Code, § 12022, subd. (b)(1)). The trial court sentenced defendant to 26 years to life in prison.

Defendant filed a timely notice of appeal. This appeal followed.

## DISCUSSION

Defendant contends that the judgment must be reversed because the trial court's instruction regarding voluntary intoxication failed to describe the relationship between defendant's methamphetamine use and the specific intent required for first degree murder by means of torture. Specifically, defendant contends that the voluntary intoxication instruction was erroneous because it precluded the jury "from considering the intoxication evidence in deciding whether [defendant] acted with the requisite intent to inflict extreme and prolonged pain."

We conclude that, because defendant did not request clarifying language and because there was not substantial evidence of methamphetamine intoxication, the trial court did not err in failing to instruct on the relationship between voluntary intoxication and the specific intent required for torture murder. We therefore will affirm.

### *Background*

The trial court instructed the jury on three theories of first degree murder: 1) premeditated murder; 2) murder by means of torture; and 3) felony murder during a robbery or attempted robbery.

The trial court instructed the jury regarding the elements of torture murder, pursuant to CALCRIM No. 521, as follows: "The defendant is guilty of first degree

7

murder if the People have proved that the defendant murdered by torture. The defendant murdered by torture if: [¶] 1) He willfully, deliberately, and with premeditation intended to inflict extreme and prolonged pain on the person killed while that person was still alive; [¶] 2) He intended to inflict such pain on the person killed for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason; [¶] 3) The acts causing death involved a high probability of death; [¶] 4) The torture was the cause of death."

Pursuant to CALCRIM No. 625, the trial court instructed the jury regarding voluntary intoxication and its effect on mental state: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with express or implied malice, or whether the defendant acted with deliberation and premeditation, or whether the defendant had the specific intent to commit robbery or attempted robbery with respect to the theory of First Degree Felony Murder. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing it that it could produce an intoxicating effect, or willingly assumes the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose."

Defendant did not object to the instruction regarding voluntary intoxication.

***The Trial Court Did Not Err in Failing to Instruct on the Relationship Between Voluntary Intoxication and the Specific Intent Required for Torture Murder***

"An instruction on the significance of voluntary intoxication is a 'pinpoint' instruction that the trial court is not required to give unless requested by the defendant." (*People v. Rundle* (2008) 43 Cal.4th 76, 145 (*Rundle*), overruled on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "If the defendant in a particular case believes voluntary intoxication is an issue that could affect the jury's determination

8

of the mental state elements of the charged crimes, he or she must request an instruction on that subject.  Any lack of clarity regarding the consideration, if any, the jury should give to evidence of voluntary intoxication, in the absence of a request for an instruction on this subject, is of the defendant's doing, and on appeal he cannot avail himself of his own inaction." (*Rundle, supra,* 43 Cal.4th at p. 145.)

In the instant case, defendant did not request clarifying or amplifying language that specifically related the voluntary intoxication instruction to the mental state required for torture murder.  Indeed, defendant raised no objection at all to the instruction regarding voluntary intoxication.  Thus, because defendant did not seek an instruction that described the relationship between voluntary intoxication and the requisite intent for torture murder, defendant's claim is not cognizable on appeal.  (See *Rundle, supra,* 43 Cal.4th at p. 145.)

Moreover, even if defendant had requested an instruction that described the relationship between voluntary intoxication and the mental state for torture murder, the trial court was not required to give such an instruction.[1]  "A defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' " (*People v. Williams* (1997) 16 Cal.4th 635, 677.)  Here, there was not substantial evidence that defendant was intoxicated as a result of his ingestion of methamphetamine, and there was not substantial evidence that the ingestion of methamphetamine affected defendant's actual formation of specific intent to torture.

---

[1] The charged crime occurred before the defense of diminished capacity was abolished. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1241 (*Pensinger*) [diminished capacity defense was abolished on January 1, 1982].)  Defendant, however, does not argue that the trial court was required to instruct on the relationship between diminished capacity and the mental state for torture murder.  Rather, defendant asserts that the trial court was required to instruct on the relationship between intoxication and defendant's actual formation of the specific intent required for torture murder.

9

Defendant testified that the methamphetamine he ingested made him feel "submissive, easy-going, friendly." None of defendant's reported symptoms corresponded with the expert testimony regarding the "spectrum of effects" caused by methamphetamine intoxication, namely increased heart rate, increased breathing rate, panic, irritability, nervousness, and increase in adrenaline. Thus, there was no evidence that defendant was intoxicated as a result of his methamphetamine ingestion. Additionally, defendant's testimony showed that the methamphetamine did not affect his perception of events or his thought process. Defendant specifically testified that the methamphetamine he ingested "didn't change the way [he] looked at things." He also testified that his methamphetamine use did not affect the fear that he felt. There was therefore no evidence that defendant's ingestion of methamphetamine affected his actual formation of specific intent to torture. Accordingly, because there was insufficient evidence of intoxication affecting formation of specific intent, the trial court was not required to instruct the jury regarding the relationship between intoxication and the specific intent for torture murder. (See *id.* at pp. 677-678 [defendant's statements that he was " 'doped up' " and "smokin' pretty tough" did not constitute substantial evidence in support of a voluntary intoxication instruction because there was "no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent"].)

*People v. Pensinger, supra,* 52 Cal.3d 1210 is instructive. In *Pensinger*, the trial court instructed on several theories of murder liability, including premeditated murder and murder by means of torture. (*Id.* at p. 1236.) The trial court instructed the jury that evidence of the defendant's intoxication could be considered in determining whether the defendant acted with malice or the specific intent to kill. (*Id.* at p. 1242.) On appeal, the defendant argued that the trial court "erred in failing to instruct on the relationship of intoxication to the intent necessary to prove a torture murder, that is, the intent to inflict cruel suffering." (*Ibid.*) Our Supreme Court held that the trial court did not err in failing

10

to instruct on the relationship between voluntary intoxication and the requisite intent for torture murder, reasoning that "there was not substantial enough evidence of intoxication in this case to require the giving of the instruction." (*Id.* at p. 1243.)

Defendant's case is analogous to *Pensinger*. Like *Pensinger*, the trial court instructed on torture murder and several other theories of murder liability, and the trial court's instruction on voluntary intoxication failed to describe the relationship between intoxication and the mental state required for torture murder. Also like *Pensinger*, there was not substantial evidence that defendant was in fact intoxicated. Thus, *Pensinger* compels us to conclude the trial court here did not err in failing to instruct the jury regarding the relationship between intoxication and the mental state for torture murder.

Citing *People v. Castillo* (1997) 16 Cal.4th 1009 (*Castillo*), defendant argues: "Having properly concluded the trial evidence supported instructions on how the jurors could consider the evidence of [defendant's] voluntary intoxication, the court was bound to instruct correctly on that defense." Defendant's argument is flawed in two respects. First, as discussed above, the evidence did not support an instruction on voluntary intoxication. Second, as explained below, *Castillo* does not require us to conclude that the trial court committed instructional error.

*Castillo* held that a defense attorney did not render ineffective assistance in failing to request a pinpoint instruction specifically relating voluntary intoxication to the mental state of premeditation and deliberation. (*Castillo, supra,* 16 Cal.4th at p. 1012.) *Castillo* reasoned that such a pinpoint instruction was unnecessary because "the trial court correctly and fully instructed the jury on the way in which the evidence of intoxication related to defendant's mental state, including premeditation." (*Id.* at p. 1015-1016.) In dicta, *Castillo* noted that "[e]ven if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*Id.* at p. 1015.)

11

*Castillo* did not consider the issue presented in this case—whether the trial court erred in failing to connect the voluntary intoxication instruction to the requisite intent for torture murder where there was not substantial evidence that defendant was intoxicated. Thus, because " 'cases are not authority for propositions not considered,' " *Castillo* does not require us to find instructional error. (*People v. Jones* (1995) 11 Cal.4th 118, 123, fn. 2.) Moreover, even if we relied on the *Castillo* dicta regarding the trial court's duty to correctly instruct the jury, we would not conclude that the voluntary intoxication instruction was legally incorrect. Defendant does not dispute that the trial court's instruction correctly stated the legal principles regarding voluntary intoxication. Defendant simply contends that the trial court failed to connect those principles to the mental state for torture murder. Given our conclusion that there was insufficient evidence of intoxication to support an instruction regarding the relationship between intoxication and the specific intent for torture murder, we cannot conclude that the voluntary intoxication instruction's silence regarding torture murder rendered the voluntary intoxication instruction legally incorrect.

In summary, we conclude that the trial court did not err in failing to instruct the jury regarding the relationship between voluntary intoxication and the requisite intent for torture murder. We therefore affirm the judgment of conviction.

**DISPOSITION**

The judgment is affirmed.

_____

RUSHING, P.J.

WE CONCUR:

_____

PREMO, J.

_____

ELIA, J.

13